Thank you, your honors. My name is Erin Whalen and I represent the Chilkat Indian Village of Kluk v and the other plaintiffs in this case. I would like to reserve five minutes for rebuttal and I will watch the clock for that. This case is about the Bureau's obligation to apply NEPA to the fullest extent possible when it acts under any statute and whether the agency met that obligation when it entirely refused to consider the potential impacts of possible mine development when approving Constantine's final stage of mineral exploration and how those impacts would affect the Chilkat Valley where so many, including my clients, depend on the natural resources that would be placed at risk by a potential mine. In the interest of time today, I'd like to focus on two issues. First, the NEPA principle this court described in Conner v. Burford, while that principle dictates the Bureau may not postpone all analysis of the authority to preclude those impacts. And second, the fact that the Bureau's refusal to consider development impacts also violates NEPA's cumulative impacts requirement because at this final stage of exploration, development was reasonably foreseeable. With respect to our connected actions argument, we rest on the briefs, but I'm available to answer any questions you may have. The basic NEPA rule described in Conner v. Burford is that the government can't give up its authority to absolutely preclude development impacts without having some understanding of what it's giving up. In other words, what the unavoidable impacts of development will be. Conner applied that rule in the Mineral Leasing Act context, where the relinquishment of authority is direct through a lease. And in this context, under the 1872 mining law, the right to extract minerals and the authority to preclude is transferred differently. The right is transferred differently and authority is lost by a different mechanism. But the difference between the two statutory schemes is not a reason to allow an uninformed decision that may commit the government to allowing development, contrary to NEPA's purposes. Counselor, can I ask you to just address head-on your opponent's response to this line of argument? And that is that they say in Conner the difference is that the agency that was being charged with violating actually did have the authority on its own to irretrievably or whatever the word is in statute commit the government's resources and had the discretion to even grant that the right, you know, for further development or not. Whereas here, BLM really is not the agency that holds the cards in this case, right? According to them, the agency actually doesn't have the authority to stop development ultimately at all unless and until the Secretary withdraws the land. So maybe you can just respond to that to see a difference in the two cases. Yes, the Secretary and the Bureau did have discretion here. The distinction between the Secretary and the Bureau is not particularly important here because at the defendants are relying on is about when an agency has no ability to prevent impacts and here the Bureau undoubtedly had an ability to request, apply for a withdrawal which the Secretary, if the Secretary ultimately approved, would become permanent. And even if the Secretary approved the application, it would trigger an automatic segregation that would become a basis even under the defendants interpretation of the Bureau's regulations to deny the agency has authority to seek that withdrawal at any time, not just in the context of land management planning and then having requested a withdrawal assuming its application is approved by the Secretary, then has authority under its own regulations to deny an exploration plan on that basis. The sequence is consistent with the regulations and that sequence of operations is also what the Bureau has done elsewhere in the Montana case that we cited. So having that authority, the Bureau couldn't essentially ignore that it was giving up that authority, that it was risking the loss of that authority by approving this exploration. In other contexts, when the agency... Can I stop you there and follow up on Judge Watford's question? Because as I understand your argument and I share his concern about trying to get your best response to your opponent's counter, which seems to me that the thing you're concerned about, the dynamic you're concerned about, is that this project brings your opponent, you know, incrementally one step closer to exploration. And that seems to me a function of the mining law. And so I think that's what Judge Watford's getting at. And if it is indeed a function of the statutory scheme that you're operating in, I don't understand any limiting principle to the argument you're making. Every step along the way in the exploration process, presumably, gets a party one step closer to production. Do you want to respond to that? Yes, thank you. The concern is not that exploration is proceeding one step closer, but it's that the Bureau is approving this final stage of exploration, which will cross the threshold of committing to ultimate development. In other words, it's the commitment that is the issue and concern and the reason that the role in Connor should apply. Well, this is why it seems that your first and second arguments, and we're setting aside I think your third for today because you submitted that in your briefs, but the first and second arguments to me seem to be really intertwined with the notion that at some point the future production is a foreseeable consequence, that you've crossed that rubicon. And I'm trying to figure out why you think this particular approval gets you there, right, under our case law. And you know, of course, I'm going to want you to answer in light of the Jones case. Why should we decide that you're there? Well, absolutely. But with respect to the cumulative impacts argument and not the Connery-Burford argument. Yes. The reason that we know... It seems to me to be very, very closely linked because in both instances it seems to me what you're really arguing about is that this project has been creeping along as many of these do for many, many years and that you now think that this approval really puts them into this other category and impacts two different ways, right? Yes. Although the foreseeability analysis, the requirement and the Connery-Burford principle is the last point in time at which the agency can do an analysis of development impacts having made a commitment. The reason we know this is a commitment here, the reason we know there was a serious risk that the agency could lose its authority, which is undisputed in this case, is that Constantine in his plan of operations, and this is at pages 293 and 302 of excerpts of record, Constantine said first of all that this was approximately a five-year plan and that at the end of that five-year plan they would be prepared to make a decision, assuming continued positive results, prepared to make a decision whether a go-no-go decision on development essentially. But the way that the Mining Act functions, by the time the company makes that decision, it will have already done the exploration needed, impliedly, to have made a valuable discovery and by that point the agency has lost its authority. That's why... I appreciate that argument and that's why it seems to me that, and maybe I'm just repeating myself, but it seems to me on that argument, which is your first argument, that that result is a function of the Mining Act. It is, and yet, and regardless of whether it's a function of the Mining Act, the fact that it's a function of the Mining Act is something that the agency is not aware of when acting under the Mining Act and all that NEPA requires is that the agency just make that decision in an informed way. The interaction of the Mining Act with FLPMA, the Federal Land Policy and Management Act, is that FLPMA allows the Bureau to make a withdrawal at any time and the agency has that discretion and essentially can't put blinders on to that discretion in making this decision on exploration. And again, what we're asking here is just analysis of development impacts, not that the agency make a withdrawal, only that it not cross the threshold of potentially committing to that withdrawal without the information in hand. That's consistent with the... But the essence of the district court's decision on the cumulative impacts analysis is that the agency didn't have, and they're not required to take into account, this goes to Jones admittedly, really an unquantifiable future project. And you know the quote I'm going to refer to on page 1001 of Jones, right? Yes, well, but I would refer your honor to a quotation from this court's decision in Connor, which is that the government's inability to fully ascertain the precise extent of effects of development essentially is not a justification for failing to estimate what those effects might be before irrevocably committing. And although the commitment here is less direct as a function of the mining act, which is distinct, the obligation under NEPA is to apply its requirements to the fullest extent possible and ensure informed decision-making. And the only way, and this court has interpreted that requirement to mean apply NEPA's requirements unless there's an irreconcilable conflict. There's no conflict between requiring, posed by requiring the Bureau to do the analysis here. Some analysis of development impacts, not the kind of analysis that the Bureau will ultimately do if Constantine submits a mine development plan. And I want to emphasize that doing an analysis of development impacts even before exploration is something this court has frequently held, frequently, but has held that the agency must do and that the Bureau does all the time in other contexts, especially leasing context. So I'm just going to get out of your way, except I have one follow-up question. And I appreciate that there are cases going both ways, depending really, really factually dependent cases going both ways. The district court in this case found that there wasn't sufficient information about what this future project is or where it's going to be. And it wasn't quantifiable or measurable. And for those reasons, those are my words, not his, but that is my summary. He decided that the agency was not required to take this into account. So I'd like you to point me to the record or explain to me, now I'm talking just factually, why you think the district court was wrong about there being inadequate data in the record. Well, it goes to what the purpose of the analysis is and what the analysis needs to be. Because if the analysis needs to be full-scale, mind-plan analysis along the lines of what will happen when Constantine submits that plan, then the district court is absolutely correct. That information may not be available at this point in time. But the purpose, and I think this is what eluded the district court, the purpose of the analysis here is not that. It is just sufficient analysis based on the best available information. And there is information available in the record about what mine development impacts are generally. Hard rock mine development impacts, the impacts or risks that are associated with developing this particular kind of mine, and information about the receiving environment. For example, and I don't want to stray too far from answering your question, but in Connerby Burford, the agency was looking at 700 leases across two different forests and 1.3 million acres. Of those, 10% would likely lead to development. So think about the difficulty in the analysis that the agency was required to do there. Here, we know that Constantine is exploring a defined set of claims and has been for decades with success. And so the scope, for example, the receiving environment is much more clearly defined than was the case in Conner. And so Conner's requirement would not yield under the circumstances here with the information, the quantum of information that's available. Can I ask though, just if you're able to put a finer point on what the analysis that the BLM would do and what it would look like. They're supposed to say, okay, well, we have to assume the worst standpoint of the environment, which is number one, that these exploration efforts bear fruit. They do yield a, what do you call it, a deposit or whatever that's worth pursuing financially. And then what? Then you would scale the operation on kind of the worst case scenario. Every single one of, you know, possible areas they hope to mine would, in fact, be developed. And that's how they would, how would the Bureau do it? Because they don't know what the scale and the scope of the eventual operation would be, right? Well, as I mentioned before, projecting out development impacts even before exploration has begun is something the agency is skilled at doing, has staff members that do, and does all the time in other contexts, analogous contexts like oil and gas development. And the information at that stage isn't perfect and isn't required to be perfect. It might be a range of impacts, for example, a range of possible development. And the question that the agency has to answer with that is, is anything within this range acceptable? And assuming it is, then the agency can proceed to make the decision. If the agency is aware, though, based on that range of impacts that nothing in that range is acceptable, given the importance of the natural resources here, then the agency would have the opportunity to seek a withdrawal prior to a discovery and investing of rights, which the agency is essentially cheating itself out of. There will be no opportunity to do that assessment and potentially make a withdrawal, if appropriate, because the Bureau has refused entirely to look at those development impacts in any manner whatsoever. I hope that answered your question. I'd like to mention a few issues. Can I ask you for some clarification? If I understood the process, the Bureau or the Secretary, I'm not going to equate them as the same. They're not. The Secretary could withdraw the area, could withdraw the land, and could do that any day now, between now and whenever, now and when this exploration effort concludes, regardless of what Constantine finds or doesn't find in their exploration. So the Secretary still has the ability to do that, regardless of this exploration project. And if the Secretary doesn't do that, the exploration is concluded, and Constantine submits a proposal for development, at that point, what options does BLM have? They do an assessment at that point, and can they impose any restrictions or do anything to stop what Constantine wants to do? Yes, Your Honor. The agency will retain regulation authority, which is something that Conor addressed. That was also the case in Conner v. Burford, that the agency would retain authority to deny unlawful plans and to regulate and prevent, mitigate impacts in a variety of ways. But the touchstone in Conor was complete preclusion authority because it is sometimes necessary, and the existence of the flip mill withdrawal provision is a great demonstration of the fact that Congress agrees with that. I see that I have only four minutes left, so with your permission, I'd like to reserve the rest of my time. That's fine. We'll hear from opposing counsel. Are you muted? Oh, I am muted, sorry. That makes it harder. Actually, I don't show I'm muted. I can hear you now. Judge Walker, can you hear? And Judge Beatty? Yes, I can hear. Okay, so I think the courtroom deputy must help me out. Again, I am Ellen Durkee on behalf of the Bureau of Land Management. I'm sharing my time with Counsel for Interveners, Mr. Clark, and I'll just mention that I think he intends to address this issue about whether it's really a final stage and so on. But what I would like to focus on first is to sort of remind us of what the parameters are here for NEPA. First of all, it applies when an agency proposes to take action under a particular statute or regulations, and NEPA works within the parameters of the law in which it's tied to. Now, I'm prepared to talk about why BLM's NEPA analysis is reasonable and appropriate, but I think I want to jump to what I think is most responsive to what my plaintiff's counsel was addressing. It seems to me that the plaintiff's and BLM's disagreement about whether BLM was required to consider and analyze potential future mine development before approving an exploration plan stems in large part from the differing views of the parties and the different conceptions and assumptions about the mining law. And so I'd like to explain why BLM's conception and assumptions are correct. The mining law is a unique statute, and it was enacted 148 years ago. It formalized a pre-existing system of free access to the public domain for mining exploration and development. The law confers a right on citizens to enter and explore for minerals on open federal lands subject to regulation. The general rule is that public lands are open. The law also grants development rights by operation of law when there is a discovery of a valuable mineral deposit, which is a term of art that means more than finding minerals, and satisfaction of other statutory requirements. The key thing here is that accrual of development rights is simply not a decision that Congress left to BLM. So under this mining law, BLM can and does regulate how an operator conducts exploration and development activities for the purpose of meeting specified safety environmental standards and to prevent unnecessary or undue degradation of service and non-mineral resources. Can I jump in? Because I don't think anything that you're saying now is disputed by the other side. I think in terms of this Connor argument, they're zeroing in on the BLM's potential authority to go to the Secretary and petition for control of the lands. And that is something that I guess if the BLM approves this project here and doesn't give the matter any further thought, the agency is giving up forever, assuming everything goes as planned throughout the next five years or so. The agency is giving up forever its ability to run to the Secretary and petition for withdrawal. And so as I understand the plaintiff's argument, it's simply this. Shouldn't the agency before giving up that right irrevocably make a fully informed decision to do so? And how can the agency do that if it does not take into account the harm to the environment that might occur if in fact a mine development project eventually goes wrong? Your Honor, I think there were several questions in there and I hope that I answered them in the right order here. First, NEPA applies to proposed actions and BLM did not propose to withdraw lands. So it did not need to do a NEPA analysis for that purpose. What its proposed action is, and it's as defined by its regulations and by the mining law, is simply to decide whether to approve or disapprove the proposed exploration plan under a set of criteria that do not allow it to veto or nullify the statutory rights that the mining law accords. Now, this argument that is essentially saying, well, we'd like you to do a NEPA analysis, not because it pertains to your actual proposed action, but because we think that it might influence BLM at some point down the line to ask for a withdrawal. I don't think that's quite it. I think what they are arguing is, not just at some point along the line, but to Judge Watford's point, and his question was, why shouldn't the agency be required to take a look? Because at some point they will indeed, as a function of the way the mining act works, lose the right to go forward and think about, consider whether to pursue this withdrawal. What's the answer to that question? Well, first of all, I do want to, you know, I think you said it, but I want to make sure, because I think it answers one of the questions, is that they don't lose that right to ask for a withdrawal by issuing a mine at this point. It's not irrevocable. Many withdrawals are done at different time periods. That goes to the earlier point, and I'm not trying to get in your way, but their argument is, right, that this takes the project one step closer, one increment closer, and that there's an indication that within five years, at this point, it's now an indication, within five years, the owners intend, hope, it's an aspiration, to move into the next phase. So, really, if you could just circle back to the question Judge Watford and I now have both asked. Well, I think it may relate to how plaintiff's counsel started her argument by saying that NEPA requires an analysis of anything possible, and I think that that's not actually accurate. It goes back to the parameters of the law that it's operating under and that it's applying and taking the action that defined, you know, the appropriate NEPA analysis. I think her argument, again, I'm not trying to tell you that I agree with the closing counsel or disagree. I'm just trying to get to answer her point, which is that by virtue of this particular law, that is exactly what she's arguing. By virtue of the way this law operates, that at some point, the agency will lose its opportunity to go forward and consider whether to withdraw. Not at this point, but, you know, it is getting really close. And so, hence Judge Watford's question, shouldn't they be required or why shouldn't they be required to consider that? That's all. That's the question. Well, I think that, you know, I guess I have a two-pronged answer to that. First of all, I think it is relevant here that, I mean, to me what it sounds like they're asking for is to, that there should have been another alternative considered in the NEPA analysis that was done. But I would point out that no one ever asked for that. And under NEPA, you're supposed to raise concerns, particularly about alternatives. Leaving that sort of waiver issue aside, I think the point is that BLM can go ask for withdrawal. It doesn't need this NEPA analysis to do that. And in fact, in the example that they provided, the Lehman case, that's exactly how it happened. Now, the Lehman case is not a NEPA case. It's actually a mine contest. And within that, they're relying on some description of background. But what that background illustrates is that it was not through the approval, the mine approval process of an exploration plan, or through the NEPA process that was ongoing for that, that, you know, made BLM decide to seek, to petition for withdrawal. And only at that point, by operational law, when it seeks withdrawal, and it's published, then by operational law, it's segregated. And therefore, it has the ability to deny and suspend the exploration plan. So what happened there is not, you know, it wasn't the NEPA process. It was actually political. Let me take another run, because I'm still not hearing an answer, or at least not a satisfactory answer to the question I posed. So they're saying that the agency is about to give up forever this authority that it otherwise holds on to as of today, which is to go to the secretary and petition for withdrawal, as I guess occurred in that Montana case that you just referred to. And all they're saying is that, how can the agency make a fully informed decision about whether to relinquish that authority if it doesn't, right now, get the information it needs to take into account the effect of going down one path or the other? That's all they're saying. I guess I'm still not hearing, why is that an unreasonable position to take, and why doesn't NEPA require that? Because there's nothing that requires BLM to consider whether to withdraw lands. I mean, you know, and truthfully, it doesn't have the authority to do that. You can only recommend or seek it. But the path, well, I guess I want to also point out, and I think the district court was right about this, these are two different processes, and they're governed by sort of different processes, and the one withdrawal process has not been invoked and was not asked to be invoked and was not proposed. And, you know, the federal land policy management is very clear that withdrawal can only occur through that process, and it's very specific. And so what they're trying to do is somehow, I think, cabin this withdrawal process into what is actually a fairly discreet, and I guess we all agree that under those regulations, you know, it did what it needed to do, which is just look at the actual exploration activities itself. So I think that sort of throwing this idea that somehow there's this possibility out there, I mean, an agency always can come up with some sort of possibilities, but it doesn't need to be looked at every single time BLM is presented with an operation plan. And there's nothing that points to saying that it has to, and frankly, I know of no instance other than the one that they've sided with, but that wasn't based on NEPA and it wasn't based on the approval process. So in some ways, I think they're mixing sort of apples and oranges here. And, you know, I think that if their goal really is to withdraw, which they denied was their goal in the reply brief, they should have asked for that. At least we would then, you know, then BLM would have had something to work with and to respond to. But instead, it only came up once it was in, you know, in district court. And so, yes, I don't have a record, you know, because this wasn't, you know, this wasn't an issue that was raised with it. But I think that if, you know, that BLM could explain that they're not going, you know, they're not going down that path. And they don't have to, you know, it's completely discretionary. There are no standards by which, you know, BLM has to ask for withdrawal and it cannot be forced to do so. The other point I guess I want to make is about the conception that the approval of an exploration plan is indistinguishable from the issuance of the leases in Conner v. Burford. I mean, the reality is that for 148 years, Congress has retained the mining law for hard rock minerals. Yet, for many other minerals, it has created leasing statutes and the paradigm is very different under a leasing statute and the mining law. The mining and the mining law, it is Congress, not BLM, it is Congress that has, you know, relinquished the authority to prevent, to preclude, you know, mining development, mining exploration. Under the mining laws, I'm sorry, the mining mineral leasing acts, what Congress has said, we're closing all the lands. No one of them are open to these minerals. So it's the exact opposite of what the mining law does. And then it gives Interior basically unfettered discretion to decide if it ever wants to allow any mining development and where that would occur and in terms of which it's, you know, it's going to do. And it does that and exercises that through a lease in which the agency is directly and proactively granting development rights. And that's what was key in Cotter. And I don't think it is analogous at all to say that something that may set off a long list of contingencies is equivalent to that. I mean, Congress just conceives of a very different approach under the mining law and mineral leasing acts. And that has implications for what BLM's discretion is when it's presented with the mineral exploration plan. And it also has implications for what is the legal cause if, you know, Constantine is able to make a discovery and take care of other requirements so that mining development right accrues. I mean, that's kind of the public citizen angle, which is just because it's a but-for cause and maybe, you know, sets off a series of things that doesn't make it the legal cause. I'm going to stop here so that my co-counsel has an opportunity to share his thoughts. Thank you, counsel. Please report. My name is Jim Clark. I'm counsel for the appellee intervenors. In 2015, when they submitted their mining plan of operations, Constantine did set out a five-year implementation plan for exploration and said that assuming positive results, it would shift from exploration to planning and development, engineering and development. But in the fly brief and throughout the briefing, the appellants continually talk about Constantine being in the last stage of exploration. And they cite for that excerpt of records 758 through 763, which is the 2017 BLM environmental assessment. And that assessment, which was prepared in 2017, in September 2017, three months before appellants filed their complaint, said that, and I quote, Constantine has not reached the point in their exploration work to make an informed decision to consider moving to the project, moving the project to the development phase. At page 763 in the excerpt of record, the BLM stated, and again, this is just three months before appellants filed their complaint, 28 months after the initial statement by Constantine. The BLM stated in September 2017, Constantine is in the early stage of the mine life cycle with operations currently focused on the exploration and refinement of the inferred resource. Examination of the environmental impacts this early in the process is limited by the available information, both about the potential for future mining and about the natural environment. Can I ask counsel, because you're almost out of time, what's the relevance of these facts you're giving us? Well, if in fact it was appellants who are trying to say that the cumulative impacts applied because the mine was reasonably, development was reasonably foreseeable because the Constantine project was in advanced exploration. And I think that if, since that's not the case, that the district court was right, that the, there is, that the mine development is not reasonably foreseeable at this point. Okay. I just didn't know which argument you were focused on. Sorry, I should have identified it, your honor. Thank you. I guess I'm out of time. No, not quite. Oh, okay. Well, I would just say then that the other thing that needs to be taken into account is the extent to which it's necessary to what BLM would have to do to hypothecate a mine. They would have to figure out the dimensions and location of the ore body. They'd have to figure out the mining method. They'd have to figure out what kind of processing facility was going to be used. They'd have to figure out what base management plans would be used. They'd have to guess at what the, how many tons per day would be mined. And this is all set out at page 28 of our, of our brief. But it just is the reason why in the, in its own environmental analysis in 2017, it said that the available information essentially was insufficient to figure out what potential future mine development would look like. Can I ask one quick question? How do you respond to your opponent's argument that what the plaintiffs are looking for or would be expecting is not some analysis of a specific mine development project that obviously doesn't exist yet. But rather what they want BLM to do is to make a threshold decision as to whether mining of the sort your clients want to pursue should be permitted at all. So just a kind of yes or no answer to that question. And for that, she says, you don't need, you know, the specifics of exactly what mine would be here and how much would mine would be ored in the like. This gets back to a point that Ms. Durkee was making, Your Honor. And that is that under the Mining Act, the, excuse me, under the Federal Land Management Policy Act and the regulations for mining under it, 3809, there are certain criteria for protecting surface resources. But there is no ability for the BLM to say no to exploration because my clients might find something, which is discovery. And there's no ability under Flipman to say no. And you can't explore because you might find something. And the finding something is decided under the mining law. And as she pointed out, in a public citizen, if you can't say no, if the agency can't say no, then what's the point of NEPA analysis? Because even if it develops NEPA analysis, it can't act on that analysis. And that's what the situation is here, that there's, since they can't say no to exploration because you might find something, then they can't act on any information they might find and NEPA isn't necessary here. Any further questions? I'm sorry to take you, we're over time, but I do have a question for you. Mr. Clark, in your brief, there's a couple of points where you indicate that maybe Constantine has already found resources of sufficient value that you could prevent Secretary from withdrawing the land. But you don't actually say that that's happened. So I wasn't clear as to what your point was. If that's already happened, it would seem as if this is all moot. But you don't explicitly say that. You just suggest that maybe it has happened. So what's the answer to that? The reason I raised that, Your Honor, was because plaintiffs assumed that it hasn't happened. And it illustrates the fact that discovery is an act that goes under the Mining Act, not under FLTMA, which was the action that precipitated the NEPA review here. It was the request for a mining plan of operations approval under FLTMA that precipitated the action. Plaintiffs say, well, we will assume that because you're asking for exploration that you haven't made a discovery yet. We won't know about whether a discovery has been made until there's been a feasibility analysis. But we have passed that portion of the test that calls for, is it reasonable to be spending money and labor on the area? We've been out there, as plaintiff's counsel has said, for a couple of decades and spent $40 million on the project. We have a good preliminary economic analysis that indicates it's a valuable deposit. But we don't have a feasibility analysis. And we have an inferred resource where we haven't completed our exploration. So we cannot say with any certainty that we have made a discovery, just as they can't say that we haven't. It's an issue that really is a mining law issue. It's not the FLTMA issue which precipitated this mining exploration request. It's FLTMA and the mining exploration request to which NEPA is attached, not the question of whether we make a discovery under the Mining Act. We are now five minutes behind. Are there any further questions from my colleagues? Thank you, Your Honor. Thank you. I think opposing counsel saves some time for rebuttal. Thank you. There you are, back. Okay, good. Go right ahead. I'd like to make two quick corrections based on what I heard and then hopefully address two other issues. One quick correction, Mr. Clark said that, well, referred to page 763, I think, of the excerpts of record and the quote that Constantine is in the early stages of the mine life cycle. That does not address whether this is the last stage of exploration. All exploration is early in the stage of a mine life cycle, which includes engineering, extraction, processing, and closure, all of which can take decades. And the last stage, the parts of the record that we rely on for the proposition that this is the last stage are Constantine's own statements in his plan of operation at ER 302 and 293. Also, Ms. Durkee referred to the E.K. Lemon case, the I.B.L.A. case, and said that in that case, I believe she said it was not prompted by NEPA analysis. I would refer your honors to, well, the pagination is a little bit difficult in that case, but I'm quoting here. BLM issued a draft DA for the exploration, and then a little further along, the 1992 proposed DA was the catalyst for the set of events that led to this appeal. And the opinion also describes public opposition to the mine based on that analysis, which in that case was an analysis that addressed an exploration plan, just as we're proposing could happen here. Another comment that Ms. Durkee made that I wanted to address is that we are saying that every single time an exploration plan is submitted, the Bureau would need to do this analysis. That isn't what we're arguing. There are many exploration plans or there are many exploration projects that can proceed without any approval from the Bureau whatsoever that are under the threshold for needing actual Bureau approval. But also, the question the Bureau would face is, when faced with a specific exploration plan, is there a risk that we could be relinquishing authority? And if the Bureau could answer that question no, then the analysis wouldn't be required under at least the Connor argument that we're making here. And that's... No risk? I'm trying to get a limited principle about when you think this would trigger. Again, my view is that this is an incremental issue as this project moves forward, any project moves forward. So, can you drill in on that for a bit? Yeah, if the agency could be confident that it wasn't relinquishing its preclusion authority, then it wouldn't be running afoul of the principle that it can't make an uninformed decision that could ultimately lead to development without... that could ultimately lead to the loss of preclusion authority. Anytime the agency's confident they're not relinquishing. Is that your rule? That's right. And in this case, we're well beyond that phase because, as I say, Constantine itself stated this was the final stage. Not in so many words, but made clear that this was a five-year plan. And at the end, they anticipated a shift to development. I'd also like to address the case Jones that Your Honor mentioned. So, in that case, there was no risk that the authority would transfer because the mining was taking place on state lands. And so there wasn't a risk of a loss of preclusion authority. And there was less information available than here. There were two cumulative impacts arguments in that case. One was about general statements the company had made about a desire to increase mining across the entire Oregon coast. And obviously that is less specific than the information we have here, which is defined exploration at a single site. And the other was whether the agency should have included an analysis of sites that the company was not currently pursuing any development at.  Thank you, Your Honors. Can I ask one just basic question that will expose my ignorance about how that flip law works? You've rested your Connor argument entirely on the BLM's authority, even though it doesn't have the authority to say no in its own right. It has the authority, you say, to run to the person who has the authority and ask them to say no. Can anyone ask the Secretary to withdraw land? I mean, could your clients go right now and petition the Secretary to withdraw the lands? Because that's really what this is all about, right? From the standpoint of your Connor argument, it's just somebody needs to get to the Secretary and make the case that mining should just not be allowed in this area at all. And so why is it so important that BLM be the actor if, let's say,  Yes, we could seek a withdrawal. We could petition for a withdrawal. However, the question here is what does NEPA require of the Bureau? And it's the Bureau's discretion to seek that withdrawal that requires the analysis. Basically, the fact that the Bureau has authority to seek absolute preclusion of this mine is what requires the analysis of what the mine might ultimately amount to before committing to that path. And I would also add that we weren't required to request a withdrawal here. We're seeking not a withdrawal but information. And it would sort of flip things on their head to say that my clients should have sought a withdrawal based on information that the Bureau is refusing to provide or consider in a public manner. Any further questions, my colleagues? Thank you, all three of you, for your helpful arguments today. We'll go ahead and take this matter under advisement, and we'll stand and recess. Thank you.
judges: Christen, Watford, Bade